**Affirmed and Memorandum Opinion filed September 29, 2022.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-21-00077-CV

**CHRISTOPHER SCOTT, Appellant**

**V.**

**BARBARA  JUNE  SCOTT, Appellee**

**On Appeal from the 507th District Court
Harris County, Texas
Trial Court Cause No. 2019-44176**

## MEMORANDUM  OPINION

Appellant Christopher Scott ("Father") appeals from a final divorce decree following a bench trial.  In two issues, Father contends the trial court abused its discretion by (1) granting Appellee Barbara June Scott ("Mother") the exclusive right to designate the primary residence of their two children contrary to the recommendation of the child custody evaluator; and (2) failing to issue findings of fact and conclusions of law.  We affirm.

BACKGROUND

Mother and Father married in February 2012. They are the parents of minor children Cameron and Donald.[1] In June 2019, Father filed his original petition for divorce asserting the marriage had become insupportable. In July 2019, Mother filed an answer and her original petition for divorce asserting the marriage had become insupportable. In October 2019, a trial judge signed temporary orders ordering that Father, "as a parent temporary joint managing conservator, shall have . . . the exclusive right to designate the primary residence of the children." Mother and Father attended a mediation and entered into a mediated settlement agreement ("MSA") on October 16, 2020. They agreed on numerous issues, including child support payments, division of property, and division of debts. However, they did "not agree on which one of them shall be awarded the exclusive right to designate the primary residence of the children." In that regard, the MSA states:

> Matters Not Resolved: The parties stipulate that a Child Custody Evaluation is being prepared by the Domestic Relations Office, and that said evaluation may contain recommendations that are not addressed in this MSA, but that the parties wish to incorporate into the Final Decree of Divorce. Therefore, the parties hereby reserve the right to amend this MSA to incorporate any recommendation from the Child Custody Evaluation that they mutually agree upon. In the event that the parties disagree on whether one or more recommendations from the Child Custody Evaluation should be incorporated into the Final Decree of Divorce, the matter shall be decided by the Court at Trial.

The parties did not amend the MSA after the child custody evaluator, Rebecca R. Briggs, submitted her child custody evaluation report on October 19, 2020.

On October 22, 2020, a two-day bench trial was held to determine which

---

[1] In this opinion, we use pseudonyms for the names of the parties' minor children to protect their privacy.

parent should have the exclusive right to designate the primary residence of the children. After hearing testimony from Father, Mother, and Briggs as well as considering the admitted exhibits, the trial court granted both (1) the "divorce as per the terms and conditions of the mediated settlement agreement"; and (2) the "suit affecting the parent-child relationship portion of the divorce as per the terms and conditions of the mediated settlement agreement and appoint[ed] the mother as the joint managing conservator with the exclusive right to determine the primary residence of the children within Harris and contiguous counties." The trial court also issued several injunctions regarding the possession of firearms, drug testing, and registration for substance abuse evaluation.

The trial court signed a final decree of divorce incorporating, among other things, its pronouncements and the parties' MSA on January 29, 2021. Father filed a request for findings of fact and conclusions of law on February 8, 2021. That same day, he filed a notice of appeal. Father filed a notice of past due findings of fact and conclusions of law on March 8, 2021.

### ANALYSIS

Father challenges the trial court's divorce decree in two issues arguing that the trial court abused its discretion by (1) appointing Mother to be the parent with the exclusive right to designate the primary residence of eight-year old Cameron and six-year old Donald contrary to the recommendation of the child custody evaluator; and (2) failing to issue findings of fact and conclusions of law. We will address each issue in turn.

## I. Exclusive Right to Designate Residence

Father contends in his first issue that the trial court abused its discretion when it determined that the best interest of the children is served by Mother's

designation as joint managing conservator with the exclusive right to designate the children's residence because "there was nothing to justify the trial court's deviation" from the child custody evaluator's recommendation.

## A.    Standard of Review and Governing Law

Trial courts have wide discretion with respect to custody, control, possession, support, and visitation matters. *In re M.S.G.*, No. 14-16-00236-CV, 2017 WL 3611907, at *8 (Tex. App.—Houston [14th Dist.] Aug. 22, 2017, no pet.) (mem. op.); *In re K.S.*, 492 S.W.3d 419, 426 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Therefore, we review managing conservatorship determinations for abuse of discretion. *In re M.S.G.*, 2017 WL 3611907, at *8; *In re K.S.*, 492 S.W.3d at 426. A trial court abuses its discretion by acting arbitrarily, unreasonably, or without reference to any guiding rules or principles. *In re Marriage of Butts*, 444 S.W.3d 147, 153 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The failure to analyze or apply the law correctly constitutes an abuse of discretion. *In re C.A.M.M.*, 243 S.W.3d 211, 215 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). The fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court in a similar circumstance does not demonstrate an abuse of discretion. *Id.* at 214. A trial court does not abuse its discretion as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id.*; *Allen v. Allen*, 475 S.W.3d 453, 456 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

Custody disputes are inherently fact-intensive. *In re M.S.G.*, 2017 WL 3611907, at *8; *Van Heerden v. Van Heerden*, 321 S.W.3d 869, 874 (Tex. App.—Houston [14th Dist.] 2010, no pet.). We also are mindful that the trial court is "best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely

reading the record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (quoting *Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.)). Therefore, we defer to the trial court's resolution of underlying facts and to credibility determinations that may have affected its determination, and we will not substitute our judgment for that of the trial court. *Id.*

When the proper standard of review is abuse of discretion, challenges to the legal and factual sufficiency of the evidence are not independent grounds for reversal; instead, they are factors to be considered in determining whether the trial court abused its discretion. *In re M.S.G.*, 2017 WL 3611907, at *8; *see In re K.S.*, 492 S.W.3d at 426. To determine if the evidence is legally sufficient, we review the entire record, considering evidence favorable to the finding if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *In re M.S.G.*, 2017 WL 3611907, at *8; *Allen*, 475 S.W.3d at 456. In addition, we indulge every reasonable inference that would support the factfinder's finding. *In re M.S.G.*, 2017 WL 3611907, at *8; *Allen*, 475 S.W.3d at 456. In a legal sufficiency review, the factfinder is the sole judge of the witnesses' credibility and the weight to be given their testimony. *In re M.S.G.*, 2017 WL 3611907, at *8. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *Id.*; *Allen*, 475 S.W.3d at 456.

In reviewing factual sufficiency, we must examine the entire record, considering evidence both in favor of and contrary to the challenged findings. *In re M.S.G.*, 2017 WL 3611907, at *8; *Allen*, 475 S.W.3d at 456-57. We may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *In re M.S.G.*, 2017 WL 3611907, at

5

*8; *Allen*, 475 S.W.3d at 457. We cannot substitute our judgment for that of the factfinder. *In re M.S.G.*, 2017 WL 3611907, at *8. If there is sufficient competent evidence to support the factfinder's decision, it must be upheld. *Id*. We may not weigh the witnesses' credibility or interfere with the factfinder's resolution of conflicts in the evidence. *Id*.

After assessing the sufficiency of the evidence, we determine whether, based on the evidence, the trial court made a reasonable decision. *Id*. at *9. We will affirm the decision unless it is arbitrary or unreasonable. *Id*.

When a court appoints both parents as joint managing conservators, it must designate to one of them the exclusive right to determine the child's primary residence. *See* Tex. Fam. Code Ann. § 153.134(b)(1). The best interest of the child is always the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child. *Id*. § 153.002; *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). "The public policy of this state is to: (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child; (2) provide a safe, stable, and nonviolent environment for the child; and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage." Tex. Fam. Code Ann. § 153.001(a).

## B. Application

We address Father's contention that "there was nothing to justify the trial court's deviation from the evaluator's reasoned recommendation" that he be appointed the joint managing conservator with the exclusive right to designate the children's residence. In that regard, Father contends that although Briggs expressed concern in her evaluation with respect to Father's use of corporal punishment, his "limited use of it cannot be a legitimate reason to deviate from the

6

evaluator's recommendation". Additionally, he argues that Briggs' mention of "the [excessive] travel time for the children from [Father's] home in Shenandoah to the children's school in Houston," would not be a reason to deviate from Briggs's recommendation because Mother testified that she planned to move closer to Father's residence so "the children's school would be changing either way". Finally, Father argues that his ownership of numerous weapons and his "enthusiasm about weapons cannot be a legitimate reason to deviate from the evaluator's recommendation" because evidence showed that he "kept his guns locked and away from the children" and "his use or possession of weapons [n]ever endangered the children."

Contrary to Father's assertion, there is sufficient evidence to support the trial court's determination that it is in the children's best interest for Mother to be the parent with the exclusive right to designate the primary residence of Cameron and Donald despite Briggs's recommendation. At trial, the court (1) heard testimony from Father, Mother, and Briggs; and (2) considered the exhibits admitted into evidence, including photos, parents' conversations via text messages, Briggs's custody evaluation report which contained statements from the parents, Grandmother, the children, and Cameron's teacher as well as the parties' personal reference questionnaires.

Mother testified that she and the children moved from Corpus Christi to Houston in July 2018 because she "no longer wanted to be part of the marriage." Mother and the children first stayed with her brother because her mother's ("Grandmother") two-bedroom apartment was not well kept. Mother performed renovations of the apartment and, in fall 2018, moved with the children into the renovated apartment shared with Grandmother.

At Grandmother's apartment, Mother shared a bedroom with Grandmother,

7

and the boys share the other bedroom. Photos introduced into evidence show that the apartment was well kept and well stocked with a variety of foods. There were photos and artwork of the boys throughout the apartment, two shelves of children's books, and the boys' bedroom had plenty of toys. Mother testified that she plays with her children "a lot" and reads to them a few times a week but she encourages them to also read daily on their own — their "daily quota for reading" is "at least 20 minutes." Mother described the kids as being very happy and smart; Donald is "very talkative" while Cameron is "more keeping to himself." Mother testified that Grandmother is also involved in the children's lives; "she's there to help care for them if I'm not present [and] she enjoys spending time with them, playing board games, watching shows with them, which she actually likes their TV shows and reading with them."

Mother testified that although she does not pay rent to live at Grandmother's apartment, she pays for the food. She stated she worked at the Houston Astros team store but has not worked since Covid-19 began in March 2020. Mother stated she is still employed by the Astros but asked to be on leave so she could help every day with the children's virtual school. Mother testified that virtual learning requires help from her, and she has to keep the kids on task which "can be difficult." According to Mother, "there's a lot of [school] meetings. There's assignments that are all online. You do do some of the — well, the children do some of the stuff on paper and then I have to send a photo or a copy of some sort to the teachers."

Because Father was temporarily given the right to designate the children's residence, Mother would drive at 5:30 a.m. to Father's apartment to pick up the boys and then drive them to her apartment for virtual schooling. Mother lives in Houston and Father lives 40 miles away in Shenandoah, so it is about 1.5 hours for

8

Mother to drive to Father's apartment. Mother makes this approximately three-hour roundtrip twice a day to ensure the children's virtual schooling. Mother acknowledged that on weekdays she has to buy "grab and go" foods because she and the kids spend so much time in the car travelling from Father's to Mother's residence and back. But Mother testified that she tries to incorporate fruits and vegetables in every meal.

Mother testified that she drives a 2004 Chevy Cavalier which Father gave her at the beginning of their relationship. The car has over 200,000 miles, and she drives her kids daily in this car. She testified that she asked Father several times if she could temporarily drive his Toyota Prius, but he declined to let her drive it.

Mother acknowledged smoking marihuana in the past. She testified: "It started as a teenager, slowed down, stopped, began again around the time I met [Father], and stopped for, you know, the course of pregnancies. I did begin again when I discovered, you know, all the pain that I had from uterine fibroids." She testified that a uterine fibroid the size of a softball was discovered in 2016, and she started using marihuana for pain management. Her doctor wanted to prescribe her pain medication "along the lines of narcotics", but Mother preferred "to not use pills." Mother testified that Father was not emotionally supportive while she was suffering from pain. Several years later, she received "permanent treatment" undergoing a total hysterectomy.

Mother also testified that she and Grandmother will move to the Spring area, so Mother can be closer to Father's residence to reduce the travel time for her and her children.

During his testimony, Father confirmed that he lives about 40 miles from Mother's apartment and the kids' elementary school. He acknowledged that it takes about 1.5 hours to drive from his house to the kids' school, but he stated that

9

he was able to get the kids to school on time since he was temporarily given the right to designate the kids' residence in October 2019 until they switched to virtual school. Father acknowledged that it is a long drive for the children and that Cameron had difficulties "staying awake at school when it was in-person." Father admitted he never considered asking Mother if she wanted to keep the children "on a Tuesday evening or another weekday evening when the kids were physically going to school in order for the children to get more sleep." Father testified he "believe[d] the superior solution would be to transfer them to Conroe ISD" (where he lives) because the "school there is better."

Father confirmed that Mother started overseeing the kids' virtual learning in March 2020, she "does a good job with the online schooling," and their grades improved with her help. Father has not "had to communicate with the teachers this year," and he has not participated in remote parent-teacher conferences. Father acknowledged that "each morning when [Mother] does the online schooling, she drives an hour and a half herself to pick up the kids, an hour and a half with the kids back to her apartment to do the — to oversee the online schooling, and then drives them for an hour and a half back to [Father's] apartment, returns the kids to [him], and then drives another hour and a half back to her apartment."

When Father was asked whether he ever offered Mother "assistance with her monthly bills or any form of compensation for overseeing the online school," he responded: "Not recently. A while back I did offer to help her, I guess, to pay her to baby-sit the children. She refused. She said I'm not going to take money to watch my own children." When Father was asked if he ever offered Mother help with gas money, he responded that Mother "never asked for gas money."

Father expressed concern that Mother's brother smokes marihuana and spends time with Cameron and David, although Father acknowledged he never saw

the brother smoke in front of the boys. Father testified that Mother has told him that her brother gave her marihuana regularly and her brother sold marihuana. Mother testified that she has not smoked marihuana in over a year. At Briggs's request, Mother submitted to drug testing and the test results were negative. Mother acknowledged that her brother smokes marihuana regularly, but she denied having any knowledge that her brother ever sold marihuana. She also testified that her brother never smokes in her children's presence. Mother testified that she would undergo a substance abuse evaluation and also submit to drug testing if the trial court ordered it. Father also acknowledged that Mother submitted to drug testing and the test results were negative.

Father testified that he has 4 handguns and 5 long guns, one of which is an AK-47, in a gun locker in his bedroom. He carries the key to the locker with him and the boys are not allowed to enter his bedroom when he is not home. However, Father testified that he always has at least one firearm in his car when he is travelling; he sometimes also has a long gun in the car which he puts "between the driver and passenger side."

Several photos of Father's apartment were introduced into evidence. His apartment appeared to be sparsely furnished, containing mainly electronics and a love seat. It did not have a dining room table, but he and the children eat their meals at a kids' plastic arts and crafts bench table. There were only a few college textbooks on a shelf in the living room but no children's books in the apartment. The apartment walls looked bare, with an occasional drawing in the kitchen and living room and two photos of the children. The kids' room also appeared minimalistic with bare walls except for what appears to be a colorful math poster. In the kitchen, there were some fruits and a lot of snacks, canned beans, and Jell-O. Father testified that he has over 40 cans of ranch style beans in his pantry and also

11

stocked up on Jell-O because the children like to eat a lot of Jell-O. He stated he mainly cooks "spaghetti and pasta" because that is what the children prefer to eat.

Admitted into evidence were also photos of Cameron and Donald riding their bikes in front of the apartment complex's garages in the parking lot. The children were not wearing a helmet while riding their bikes, although Father testified that they have helmets. Father stated he has no concerns regarding his children riding their bikes alone in the parking lot with moving vehicles around.

With regard to family activities, Father testified he and the boys play video games, go outside, and the boys ride their bikes. Father also reads to them 10 to 15 minutes at night in their bedroom. According to Father, he reads them Aesop's fables or the King James Bible, which he described as being an eighth grade reading level book. Father also admitted to spanking the children "for disrespect for authority." He stated he strikes them with a belt two to four times across the buttocks.

Father acknowledged that every three and a half weeks, he is on call for his job for one week and also has to work on weekends when on call. Being on call for emergency assistance is "a regular responsibility of [Father's] job." Father admitted that he had to take the children several times to a 24-hour daycare after 10 or 11 p.m. because there were emergencies at work.

Child custody evaluator Briggs testified only briefly at trial. Briggs admitted she has concerns about Father being emotionally distant from his children and failing to communicate with his children before using corporal punishment. Her submitted report entered into evidence was 33 pages long and provided the trial court with a lot more information, including statements from the parents, both children, Grandmother, and one of the children's teachers. With regard to the children, Mother stated, among other things, that she does not use any physical

12

discipline. Instead, she uses positive reinforcement and, most of the time, the children listen to her. "For family fun, they like to play video games, and go to the park, go to Chuck E. Cheese, get together with family and friends, go to the beach, go out to eat, or go swimming," although "the COVID-19 crisis has changed some of these activities."

During the interview, Mother expressed concern that (1) Father does not encourage education and that there have been times when no homework was completed when the children were with Father; (2) the children have not been to the dentist in two years because Father sees no "point of the children having a dental cleaning when they were younger because it was costly"; (3) Cameron had behavioral issues in school but Father refused counseling at the school; (4) Cameron "was falling asleep in school because the children stay up late at the father's home"; (5) Father does not feed the children well and feeds them unhealthy and sugary snacks only; and (6) Father uses corporal punishment to discipline the children. Mother also claimed that the children are unhappy with Father and she has been their primary caregiver their whole lives until October 2019, so she should be the primary conservator of the children.

Father told Briggs during his interview that Mother had been the primary caretaker for the boys during their marriage and that he worked a lot. "He stated she was a good and concerned mother. He feels she tries hard to keep the boys safe. The father does not feel her [marihuana] use had any impact on the children." According to Father, his "main issue with the mother's drug use is that it brings the children around unsavory criminals." Father "stated the 'criminal element' is" Mother's brother, whom he believes to be a heavy marihuana user who also provided Mother with marihuana in the past.

Further, Father "stated that for discipline of the children, he talks to them,

uses logic, puts them in the corner, or spanks them" about every three months; "the boys are responsive to him." For family fun, Father and the boys play video games, go to the park, play with neighbors' children, go to Chuck E. Cheese, go to the movies, and get together with family. Father stated that he should be the primary conservator of the children because he is (1) financially able to support the children; (2) a better role model for the children and has no criminal history; (3) better educated; and (4) able to provide for the children's educational needs.

Grandmother stated during her interview with Briggs that she helps Mother with the children if Mother cannot be there. Grandmother stated she prepares food and interacts with the children. "For discipline, she talks to them in calming tones or gives them timeout. She also tries to teach them conflict resolution. For family fun, they watch videos, go to Chuck E. Cheese, go to movies, to the park, take walks, and [she] read[s] to them."

Regarding Cameron's behavioral issues, Grandmother stated that Cameron "was living with the father and not getting enough sleep. He was angry and acting out due to the divorce." Regarding the parties' parenting skills, Grandmother explained that Mother "is very good with the boys. She is interactive with them," but Father "does not interact with them to a great degree." Grandmother stated she "feels the children should live with the mother. They will be more safely cared for in the mother's home and will have more social interaction."

Briggs also interviewed Cameron's former elementary school teacher for the 2019-2020 school year. The teacher told Briggs that Cameron would come to school "extra tired." Cameron would eat breakfast at school, fall asleep, and sleep all morning. The teacher indicated this happened on a regular basis. Cameron would usually be awake for lunch and recess, but "then would 'crash' in the afternoons. He rarely did activities in the classroom." Cameron "would say that

14

he 'lived far' and had to get up early for school and that made him tired." The teacher stated "she could tell the days that he had been with the mother versus the father." The teacher noted a dietary difference in the lunches that the parents sent. As an example, the teacher stated that Mother sent "a sandwich, a vegetable, and a fruit," while Father sent "high sugar items" like a Nutella sandwich, a juice, and a fruit rollup.

Importantly, Briggs interviewed the children at each parent's residence. She outlined Cameron's statements following his interview with her at Mother's house, in relevant part, as follows:

- "[H]e likes school but he does not like math. He likes reading. He is reading the book 'Diary of a Wimpy Kid' right now. He showed [Briggs] this book."

- "He indicated the current homeschooling is going fine. He stated the mother is helping him with school work."

- "He wants to be a gamer when he grows up. [Cameron] reported that he likes the mother's house more because he has more gaming systems here."

- "Regarding the daily living tasks in the mother's home, [Cameron] stated the mother and [Grandmother] do the cooking . . . [and] the laundry. The mother takes him to the doctor and dentist as needed. The mother helps with his schooling at home and his homework. His chore is to put in the trash bag."

- "Regarding discipline at the father's home, the father spanks him and puts him in the corner. . . . He stated he has had bruises and marks in the past. He denied any current bruises or marks. Regarding the

15

father, he stated, 'He gets mad when I don't do work at school.' He stated he gets spanked about once a month. He stated he gets spanked more than his brother. The father does not talk to him for correction." Cameron "commented that the father does not talk much to the mother either. For fun at the father's house, they play on the Wii-U and the Nintendo."

- "Regarding the daily living tasks in the father's home, the father does the cooking." Cameron "stated he does the laundry. He indicated he does everything with the laundry but fold the clothes. The father folds his own clothes. [Cameron] stated he was seven years old when he started doing laundry." . . . "The father does not take him to the doctor or the dentist. The father sometimes helps him with his homework. His chores include laundry, helping to clear the dinner table, and putting the dishes away. His brother helps with clearing the table."

Briggs memorialized Cameron's statements following his interview with her at Father's house, in relevant part, as follows:

- Cameron "stated school is good. He indicated he is still schooling at home with the mother on a daily basis. He stated he is learning sometimes. When they arrive at the mother's home in the mornings, they do their school work on tablets."

- "Regarding discipline at the father's house, he stated he goes into a corner near the table. He stated he might get some spankings. He stated he has not had any spankings from the father since the Corona virus started. . . . He gets spanked with a belt. He stated he and the father usually do not talk about what he did wrong. He denied any

16

current marks or bruises from being spanked."

- During the interview, "[t]he father asked [Cameron] to read a book. [Cameron] showed this evaluator the book.  It was an adult level book entitled 'Joy of Digital Photography' by Jeff Wright.  [Cameron] stated he read the first fifteen pages."

- "He stated that for discipline at the mother's house, they talk about it." Cameron "stated that he and the mother get along.  He misses her when they are apart."

Briggs summed up Donald's statements following his interview with her at Mother's house, in relevant part, as follows:

- Donald "indicated he likes the current situation of schooling at home. . . .  The mother helps with the current schooling at home and with their homework.  [Cameron] will also help him at times."

- "Regarding the daily living tasks in the mother's home, the mother and [Grandmother] do the cooking and the laundry.  The mother takes him to the doctor and dentist when he needs to go.  . . .   The mother cleans the home.  For chores in the mother's home, he picks up his toys."

- Donald "reported that no one smokes in the mother's house.  He stated the mother used to smoke but not anymore.  He stated she stopped on his birthday.  No one smokes at the father's house. [Donald] stated he is allergic to smoke."

- "Regarding discipline at the mother's home, the mother talks to them. Sometimes she takes them outside and talks to them.  She will also threaten to spank them.  [Donald] reported that sometimes he listens

17

to the mother. He stated, 'Sometimes I get mad at her.' He reported that his brother [Cameron] throws chairs at him and kicks the mother in the leg. When [Cameron] does this, the mother takes him outside. For family fun, they [go] to the store, to Chuck E. Cheese, to Dave [and] Buster's, and play video games. [Donald] reported that they used to have a Wii-U."

- "Regarding discipline at the father's house, [Donald] stated the father 'spanks us.' The father sometimes hits them twice or five times if they do not comply. If they don't get to bed on time, he spanks them. [Donald] stated, 'Anything we do wrong at his house — he'll just spank us.' He spanks them with a belt. The father spanks him on his buttocks. He stated he does not get bruises — just red marks. [Donald] stated he feels sad when he is spanked. The father does not talk to them about what they did wrong. [Donald] also indicated that the father will put them in the corner when they misbehave. For family fun, the neighbor [sic] kids come over and play, they ride bikes, and play video games."

- "Regarding the daily living tasks in the father's home, the father does the cooking. [Cameron] makes macaroni. [Donald] stated the father forces him to eat broccoli. He indicated he does not like broccoli. The father and [Cameron] do the laundry. [Cameron] and [Donald] take the trash [out] at the father's home. . . . At the father's house, [Cameron] and [Donald] clean the home. . . . The father tells [Donald] to clean out the dust in the father's home, but [Donald] is allergic to dust. He uses an inhaler and also medicine for his asthma."

- Donald "stated he feels most comfortable in the mother's house

18

because 'she doesn't spank us.' The mother bought them a parachute toy and that is another reason [Donald] feels more comfortable in the mother's home. [Donald] stated he is scared of heights. He sleeps on the bottom bunk because of this fear."

Finally, Briggs summarized Donald's statements following his interview with her at Father's house, in relevant part, as follows:

- "Regarding discipline in the father's home, [Donald] stated the father sometimes spanks him and sometimes he puts him [in] time-out. Sometimes the father asks [Donald]'s opinion as to what [Cameron]'s punishment should be. The father does not talk to them when they get in trouble. One of the things that they get in trouble for is not going to sleep."

- "Regarding discipline in the mother's home, he stated the mother talks to him."

- "Regarding guns, [Donald] stated the paternal uncle has guns in his house. He stated . . . the paternal uncle kept his gun in his pocket. . . . He stated the maternal grandmother has no guns in her house. The father has guns in his house. He stated the father has guns in a 'silver thing' in the father's bedroom" but Donald and Cameron "are not allowed in the father's bedroom when the father is not there."

- Donald "stated sometimes the father says mean things about the mother and to the mother. When asked what the father says, [Donald] said, 'I forgot.' The father tells [Donald] at times he is dumb. The father also comments on certain video[s] that they are dumb. He stated the mother does not say mean things."

- "Regarding his relationships with family members, David indicated he gets along with [Mother]. Regarding his relationship with the father, [Donald] stated, 'Not that much.' He indicated the spanking by the father is an issue for him. . . . [Donald] stated he is most comfortable in the mother's house. He stated, 'She doesn't spank us.' He stated the last spanking with the father was six days ago. He stated he got in trouble for not going to sleep."

Here, considering the ample evidence discussed above and indulging every reasonable inference that would support the trial court's conclusion, we determine there was sufficient evidence to support the trial court's decision. The trial court is not required to accept and follow a child custody evaluator's custody recommendation, especially when the evidence supports a custody determination that is contrary to that of the evaluator's recommendation,[2] nor does Father cite any authority supporting such a notion. After reviewing the entire record and also giving great deference to the trial court's ability to observe the witnesses and assess intangibles not apparent in the written record, we conclude that the trial court (1) had sufficient information upon which to exercise its discretion to determine that it is in the children's best interest to appoint Mother as joint managing conservator with the right to designate the children's primary residence; and (2) did not err in its application of that discretion.

Accordingly, we overrule Father's first issue.

## II. Findings of Fact and Conclusions of Law

In his second issue, Father argues he was harmed by the trial court's failure

---

[2] *See In re K.K.R.*, No. 04-18-00250-CV, 2019 WL 451761, at \*5 (Tex. App.—San Antonio Feb. 6, 2019, no pet.) (mem. op.) ("Although the trial court's decision was contrary to the evaluator's recommendation in the social study, the social study . . . was only a portion of the evidence the trial court considered in making its ruling.").

to issue findings of fact and conclusions of law because this failure prevented him from (1) determining the basis for the trial court's ruling, and (2) narrowing the basis for the appeal. Father, therefore, asks us to abate the appeal and order the trial court to issue written findings of fact and conclusions of law.

### A. Governing Law

"In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law." Tex. R. Civ. P. 296. The party must file its request within twenty days after the court enters its judgment, and the court clerk must immediately bring the request "to the attention of the judge who tried the case." *Id*. The court must file its findings and conclusions within twenty days of the timely request. Tex. R. Civ. P. 297. If the court fails to file findings and conclusions within twenty days, the requesting party may file a notice of past due findings and conclusions within thirty days of the initial request. *Id*.

If the trial court fails to file findings and conclusions in response to a proper and timely request, the court of appeals must presume the trial court made all the findings necessary to support the judgment. *Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 135 (Tex. 2017); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). A party may rebut the presumption by demonstrating that the record evidence does not support a presumed finding. *Ad Villarai, LLC*, 519 S.W.3d at 135; *Merlo v. Lopez*, No. 01-19-00102-CV, 2021 WL 278060, at *5 (Tex. App.—Houston [1st Dist.] Jan. 28, 2021, no pet.) (mem. op.). If a court fails to file findings when the facts are disputed, the burden of rebutting every presumed finding can be so burdensome that it effectively "prevent[s the appellant] from properly presenting its case to the court of appeals or this Court." *Ad Villarai, LLC*, 519 S.W.3d at 135 (quoting *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261,

21

263 (Tex. 2014) (per curiam)). A trial court's failure to file findings in response to a timely and proper request is therefore "presumed harmful, unless 'the record before the appellate court affirmatively shows that the complaining party has suffered no injury.'" *Id*. (quoting *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989) (quoting *Wagner v. Riske*, 178 S.W.2d 117, 120 (Tex. 1944))).

An appellant generally is harmed when there are two or more possible grounds on which the court could have ruled and the appellant is left to guess the basis of the trial court's ruling effectively preventing the appellant from properly presenting his case on appeal. *Madore v. Strader*, No. 14-20-00147-CV, 2021 WL 4617936, at *6 (Tex. App.—Houston [14th Dist.] Oct. 7, 2021, no pet.) (mem. op.); *see also Graham Cent. Station, Inc.*, 442 S.W.3d at 263. Conversely, the presumption of harm generally does not apply to a simple case "because an appellant is not faced on appeal with the task of dissecting multiple permutations of why the trial court may have ruled as it did." *See York v. Cooper-York*, No. 02-20-00356-CV, 2021 WL 2753527, at *3 (Tex. App.—Fort Worth July 1, 2021, pet. denied) (mem. op.) Accordingly, when only a single ground of recovery or a single defense is presented to the trial court, the appellant has suffered no harm because he is not forced to guess the reasons for the trial court's decision. *Id*.; *Mora v. Mora*, No. 04-17-00428-CV, 2018 WL 4903079, at *4 (Tex. App.—San Antonio Oct. 10, 2018, pet. denied) (mem. op.); *see also Hernandez v. Moss*, 538 S.W.3d 160, 165 (Tex. App.—El Paso 2017, no pet.); *Slater v. Slater*, No. 14-13-00693-CV, 2014 WL 6677603, at *3 (Tex. App.—Houston [14th Dist.] Nov. 25, 2014, no pet.) (mem. op.).

## B.    Application

Father timely filed a request for findings of fact and conclusions of law.

However, his request was very specific in that it focused only on matters of property division:

> Petitioner, Father, requests the Court to state in writing the findings of fact and conclusions of law as provided by rules 296 and 297 of the Texas Rules of Civil Procedure and section 6.711 of the Texas Family Code[3] with respect to the Final Decree of Divorce signed on January 29, 2021.
>
> Without limitation, Petitioner, requests that the Court's findings and conclusions include the characterization and value of all assets, liabilities, claims, and offsets on which disputed evidence has been presented.
>
> Petitioner further requests that the clerk of the Court immediately call this request to the attention of the Court pursuant to rule 296 of the Texas Rules of Civil Procedure.
>
> Petitioner further requests that the Court cause copies of its findings and conclusions to be transmitted to each party in the suit as required by rule 297 of the Texas Rules of Civil Procedure.

However, property division was not an issue at the bench trial because the parties already had signed an MSA regarding any property, assets, liabilities etc. Father never asked the trial court to issue findings with regard to the only issue presented and litigated during the bench trial and now challenged by Father on appeal, namely, which parent should have the right to designate the children's primary

---

[3] Section 6.711 provides:

(a) In a suit for dissolution of a marriage in which the court has rendered a judgment dividing the estate of the parties, on request by a party, the court shall state in writing its findings of fact and conclusions of law, including the characterization and value of all assets, liabilities, claims, and offsets on which disputed evidence has been presented.

(b) A request for findings of fact and conclusions of law under this section must conform to the Texas Rules of Civil Procedure.

(c) The findings of fact and conclusions of law required by this section are in addition to any other findings or conclusions required or authorized by law.

Tex. Fam. Code Ann. § 6.711.

residence.[4] Thus, Father cannot now complain that the trial court failed to issue findings and conclusions on an issue he did not request; his complaint is without merit.

Even if we were to presume Father had not waived his complaint, we would conclude that he was not harmed. First, we note that while Father claimed he was harmed because the trial court's failure to file findings and conclusions prevented him from determining the basis for the court's ruling, Father negated his claim that he was harmed by also stating: "This Court must presume that the trial court made all factual findings necessary to support its judgment. [Father], however, has effectively rebutted this presumption by showing that the record and evidence do not support the trial court's decision." (citations omitted).

Second, this was a relatively simple case concerning one issue: which parent should have the exclusive right to designate the children's residence. The parties each presented arguments to the trial court and fully briefed their arguments on appeal, affirmatively showing a lack of harm. *See Slater*, 2014 WL 6677603, at *3; *Watts v. Oliver*, 396 S.W.3d 124, 131 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Rumscheidt v. Rumscheidt*, 362 S.W.3d 661, 666 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Further, as this court previously held, because a complete reporter's record was filed, Father was able to fully brief, and we were able to fully review, whether the judgment is supported by evidence. *See In re*

---

[4] Father's notice of past due findings of fact and conclusions of law provided:

Pursuant to Rule 297 of the Texas Rules of Civil Procedure, [Father], Petitioner, files this Notice of Past Due Findings of Fact and Conclusions of Law regarding the divorce against [Mother], Respondent, and states as follows:

The original request for the Court's findings of fact and conclusions of law was filed by [Father] on FEBRUARY 8, 2021. The findings and conclusions were due on FEBRUARY 28, 2021 but were not timely filed.

Upon the filing of this Notice, the time for the Court to file findings of fact and conclusions of law is extended to MARCH 28, 2021.

*C.C.G.*, No. 14-15-00015-CV, 2016 WL 3157472, at *2 (Tex. App.—Houston [14th Dist.] May 17, 2016, no pet.) (per curiam); *In re J.I.T.P.*, 99 S.W.3d 841, 849 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Additionally, Father has not identified any issue that he was unable to brief as a result of the trial court's failure to issue findings of fact and conclusions of law. *See In re C.C.G.*, 2016 WL 3157472, at *2; *Watts*, 396 S.W.3d at 131; *Rumscheidt*, 362 S.W.3d at 666. The record in this case affirmatively shows Father suffered no harm.

Accordingly, we overrule Father's second issue.

## CONCLUSION

We affirm the trial court's final decree of divorce.


/s/      Meagan Hassan
Justice


Panel consists of Justices Jewell, Zimmerer, and Hassan.

25